UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KELLY MATHERNE                                                    CIVIL ACTION

VERSUS                                                            NO. 12-2461 C/W
                                                                  12-2462 &12-2584

RUBA MANAGEMENT                                                   DIVISION "3"

ORDER

On June 17, 2014, the Motion for Summary Judgment [Doc. #56] came on for oral hearing before the undersigned. Present was Lauren Tafaro on behalf of defendant. Counsel for plaintiffs failed to appear. After the oral hearing, the Court took the motion under advisement. Having reviewed the motion, the opposition and the case law, the Court rules as follows.

I.     Background

Ruba Management ("Ruba" or "IHOP") is a limited liability company that owns or leases properties on which various International House of Pancake restaurants are located. Ruba owns the land in Boutte, Louisiana on which an IHOP sits. Ruba maintains an Employee Handbook that outlines its employment policies and procedures, including its policy against any form of harassment. [Doc. #56-4, Ex. B-1]. Specifically, the company "maintains a strict policy prohibiting harassment based on a person's sex, age, race, color, religion, national origin or disability." [*Id.* at p. 3]. An employee who feels that he/she is the victim of harassment should report the harassment

to his/her "supervisor, the personnel manager, or the store manager." [*Id.*]. Additionally, employees who witness others being harassed should likewise report the harassment. [*Id.*]. After receipt of a complaint, Ruba will "investigate[], and when appropriate, corrective action, including disciplinary action, will be taken." [*Id.*]. If an employee has reported harassment and is dissatisfied with the action taken, she is to immediately report the dissatisfaction to a higher authority. [*Id.*].

Ruba's policy is to provide a copy of the Employee Handbook to all employees during their orientation. Additionally, as part of the orientation process, employees are expected to watch a video entitled "Shades of Harassment," which explains the policy against harassment and provides specific examples of conduct that is not tolerated.

Plaintiffs Kelly Matherne, Patricia Hyatt,[1] and Sharetha Tart each worked at the IHOP in Boutte and allege in their separate complaints that they were the victims of sexual harassment during their employment. They allege that they were constructively discharged as a result of the alleged harassment. They each filed individual suits against Ruba. The parties consented to proceed before the undersigned, and this Court consolidated the lawsuits for trial for the purpose of liability only. The Court now outlines the specific facts alleged by each plaintiff.

A.     **Plaintiff Kelly Matherne**

In March 2012, IHOP hired Matherne to work at its Boutte location as a server. She received a copy of the company's Handbook during orientation. [Doc. #56-6 at p. 41]. She read through the Handbook and understood that the company prohibited any type of discrimination and harassment in the workplace. [*Id.* at p. 42]. She understood that she should report any discrimination or

---

[1]     Patricia Hyatt has since settled her lawsuit with Ruba. [Doc. #38, Civ. A. No. 12-2584, E.D. La.]. This motion is thus moot as to her.

harassment to a manager. [*Id.* at pp. 42-43]. She did not see the video entitled "Shades of Harassment." [Doc. #63-3 at p. 86].[2] Matherne worked the night shift from 10:00 p.m. until 6:00 a.m., and her managers were Charlotte Owen and Bob McCormick. She alleges that during her employment, four employees harassed her: Tom, Rafael, Melvin (all three cooks) and McCormick (a manager).

At her deposition, Matherne testified that McCormick made a comment to her husband and Hyatt's husband that "women were good for two things," "bitching" and the other he "couldn't name." [Doc. #56-6 at p. 55]. This was a one-time comment that Matherne overheard. [*Id.*]. Additionally, in response to a statement by Hyatt that someone had touched her chest, McCormick allegedly stated, "[I] didn't even get that chance." [*Id.* at p. 56]. Finally, Matherne testified that McCormick once told her not to "cross the line" with customers and flirt with them. [*Id.* at p. 57]. McCormick made no other sexually-related comments. [*Id.*]. None of the comments made by McCormick was reported. [*Id.* at p. 63].

Matherne testified that Tom "call[ed] [her] name" a lot, told her that "he loved [her]" and that "he wanted to go back to Mexico with [her]." [*Id.* at pp. 63-64]. She also testified that he grabbed her waist and kissed her neck on one occasion. [*Id.* at p. 64]. She asked him not to touch her again, and he complied. [*Id.* at p. 65]. There were no other comments or touchings by Tom. Matherne testified that she reported the conduct to McCormick and Owen. [*Id.* at pp. 66-67]. She does not know if either of them ever had a conversation with Tom in response to the complaints, but she knew that McCormick was to document the complaint in a "complaint book," an entry that

---

[2] The Court cites the documents as counsel originally e-filed them separately into the record. Although the Clerk of Court consolidated all separately filed documents into one, it is easier for the Court to cite to them as originally filed.

Owen confirmed that he never made. [*Id.* at p. 68-69]. After receipt of the complaint, Owen immediately investigated it by reviewing the surveillance cameras and speaking to Matherne and Tom. [Doc. #56-7 at pp. 12-13]. Owen could not substantiate Matherne's allegations. [*Id.*]. With regard to her complaints about the kissing incident, Matherne testified that Owen told her to ignore it, and McCormick laughed and told her not to worry about it. [Doc. #63-3 at p. 77]. Hyatt testified at her deposition that she witnessed Tom grab or slap Matherne's "butt" "[m]aybe twice." [Doc. #63-2 at p. 155].

Matherne testified that Melvin would "brush by [her] and brush [her] with his arm against a certain part of [her] body." [Doc. #56-6 at p. 72]. She stated that he touched her arm and brushed against her "front" and "back" once or twice per week. [*Id.* at p. 73]. This thus happened four to eight times as Matherne worked at IHOP for a month. Melvin would also tell her that he "loved" her. [*Id.*]. He twice told her that her "husband could not give [her] a Mexican baby," and approximately three times he told her "he wanted [her] to have his baby." [*Id.*]. Matherne testified that she reported this conduct to Owen and McCormick but does not know if they did anything in response to her complaint. [*Id.* at pp. 76-77].

Lastly, Matherne testified that Rafael said, "I love you," to her twice and said that she was "skinny." [*Id.* at p. 86-87]. He also approached her from behind, put his arms around her and tried to kiss her. [*Id.* at p. 89]. As she tried to push him off of her, he grabbed both of her wrists. [*Id.*]. When she told him to leave her alone, he let go and walked away. [*Id.*]. Rafael left bruises where he grabbed Matherne; photographs allegedly corroborate the bruises. [Doc. #63-3 at p. 108]. Matherne told her husband about what happened, and he voluntarily called the police. [Doc. #56-6 at p. 92]. The police arrived at the restaurant and spoke to those involved but did not fill out a

4

police report. [*Id.* at p. 96]. The night manager on duty asked Matherne to write a statement to give to the General Manager, Lisa Garrison, when she arrived that morning. [*Id.* at p. 93]. Garrison was advised of the incident when she arrived and immediately investigated. [Doc. #56-4 at ¶ 8]. She and the night manager reviewed the surveillance footage, but there was no indication from the footage that any altercation or interaction between Matherne and Rafael had occurred. [*Id.*]. There were no witnesses to the incident. [*Id.*]. Garrison also met with Matherne and Rafael separately to discuss the allegations. [*Id.*]. Although Matherne's allegations were not corroborated, Garrison changed Rafael's shift, and he then transferred to a different store. [*Id.*]. Matherne did not return to work and eventually resigned approximately two weeks later. [*Id.*; Doc. #56-6 at p. 103]. Matherne worked at IHOP for approximately one month.

      **B.**     **Sharetha Tart**

In March 2012, IHOP hired Tart to work as a cook. She worked for approximately one month before she resigned. Tart was aware that the company prohibited any discrimination and harassment and that she should report complaints to her manager. [Doc. #56-7 at p. 43-44]. She recalled seeing postings with the anti-harassment policy. [*Id.*]. Tart claims that during her employment, she was harassed by two other cooks.

Tart testified that Manual, an IHOP cook, grabbed her face and tried to kiss her on one occasion. [*Id.* at p. 64]. On that same occasion, he also made a "jacking off" gesture. [*Id.*]. He also suggested that she would not be working if she was his woman, that she had a "big booty" and that she knew how to "ride." [*Id.* at pp. 64-65]. She reported the conduct to McCormick, who responded that she was overreacting but that he would talk to Manual. [*Id.* at p. 67]. Tart does not know whether McCormick spoke to Manual about the alleged conduct or whether he reviewed surveillance

5

footage.  [*Id.* at pp. 68-69].   She does not know whether Manual was disciplined as a result of the complaint.  [*Id.* at p. 77].

Tart also testified that she was harassed by another younger, "Spanish" cook whose name she can not remember.  [*Id.* at p. 73]. She testified that the cook told her that she was "sexy" and that he would "bend [her] over."  [*Id.* at p. 75].   Her response to him was "F you."  [*Id.*].  He and the other cooks would speak Spanish and laugh, but Tart could not understand what they were saying. [*Id.*]. She reported the conduct to McCormick who told her he would look into it.  [*Id.* at p. 77]. She does not know whether McCormick investigated the complaint or whether the cook was disciplined. [*Id.*].

Other than Manual and the younger, unnamed Spanish cook, Tart had no other problems with any of the employees. She sought a shift change to get away from the harassment.  [*Id.* at p. 62].  Her request was granted, and she was moved to the evening shift.   [*Id.*]. Once she changed shifts, she no longer worked with a harasser.  [*Id.* at pp. 62-63].   She had no problems with any of the employees on the new, evening shift.  [*Id.* at p. 104].  Yet she resigned from her employment one week later. She worked with the harasser for three weeks.

**II.     Law and Analysis**

    **A.     Summary Judgment Standard**

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in [his] favor."

*Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325; *Lavespere*, 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Celotex*, 477 U.S. at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial. *See id.* at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

   B.   **Law and Analysis**

      1.   **Hostile Work Environment Claim**

Ruba maintains that neither Matherne nor Tart can meet the standards to establish a hostile work environment. A hostile work environment claim consists of five elements: (1) the employee was a member of a protected group; (2) the employee was subjected to unlawful harassment; (3) the harassment complained of was based on a protected characteristic, *e.g.*, sex; (4) the harassment complained of affected a "term, condition, or privilege" of employment; and (5) the employer knew or should of have known of the harassment and failed to take prompt remedial action. *Woods v. Delta Beverage Group, Inc.*, 274 F.3d 295, 298 (5th Cir. 2001). A *prima facie* case of hostile work environment under Title VII requires a plaintiff to show that "more than just a few isolated incidents of [sexual] enmity" occurred. *Roberts v. Tex. Dep't of Human Servs.*, 275 F.3d 1083, 2001 WL

7

1468757, at *2 (5th Cir. Oct. 31, 2001). Occasional comments do not rise to the level of severe or pervasive harassment. *See id.* "It is only a violation of Title VII when the workplace is so 'heavily polluted with discrimination as to destroy the emotional and psychological stability of the minority [employee].'" *Id.* (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971)).

Specifically, Ruba contends that neither plaintiff can establish the fourth element, *i.e.*, that the harassment complained of affected a term, condition, or privilege of employment. For harassment to affect a term, condition or privilege of employment, it must be both objectively and subjectively abusive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted). The Fifth Circuit has held that, to survive summary judgment, the alleged conduct must be more than rude or offensive comments, teasing, or isolated incidents. *Shepard v. Comptroller of Pub. Accounts*, 168 F.3d 871, 873 (5th Cir. 1999). To determine whether conduct is objectively abusive, courts look to the totality of the circumstances, the frequency of the discriminatory conduct, its severity, whether it involves physical threats or humiliation as opposed to mere offensive utterances, whether it unreasonably interferes with an employee's work performance, and whether the complained-of conduct undermined the plaintiff's workplace competence. *See id* at 787-88; *Hockman v. Westward Commc'ns, L.L.C.*, 407 F.3d 317, 325-26 (5th Cir. 2004).

The Supreme Court has long held that Title VII is not meant to be a "general civility code" for all workplace incidents that involve boorish behavior. *Faragher v. City of Baton Rouge*, 524 U.S. 775, 788 (1998). Citing a plethora of case law, Ruba argues that courts have routinely held that

behavior that is much more egregious than that alleged here has failed to rise to the level of a hostile work environment. *See, e.g., Gibson v. Potter*, 264 Fed. Appx. 397, 398 (5th Cir. 2008) (holding that conduct of supervisor who "grabbed [plaintiff] on the buttocks and made suggestive comments" while she was conversing with another employee was not "sufficiently severe or pervasive to alter a term or condition of [plaintiff's] employment"); *Hockman v. Westward Commc'ns, L.L.C.*, 407 F.3d 317, 328 (5th Cir. 2004) (holding that sexually-suggestive comments, slapping plaintiff on the behind with a newspaper, grabbing or brushing up against plaintiff's breasts and behind, and attempting to kiss plaintiff did not qualify as severe); *Derouen v. Carquest Auto Parts, Inc.*, 275 F.3d 42, 2001 WL 1223628, at *1 (5th Cir. Sept. 24, 2001) (holding that plaintiff's allegations that co-worker attempted to grab her breast and later touched and rubbed her thigh, that customers made sexually-threatening remarks, and that supervisors did not respond to her complaints about these incidents, did not support a hostile work environment claim).

### a.     Matherne

Matherne's allegations of sexual harassment include the following:

1. McCormick's comment that "women were good for two things," "bitching" and the other that he could not name (not directed toward Matherne).
2. McCormick's instruction not to "cross the line" and "flirt" with the customers (once).
3. McCormick's comment that he "didn't even get that chance" (once and not directed toward Matherne).
4. Tom called her name.
5. Tom, Melvin and Rafael said that they loved her.
6. Tom told her that he wanted to go to Mexico with her.
7. Melvin told her that her husband could not give her a Mexican baby (twice).
8. Melvin told her that he wanted her to have his baby (three times).

Additionally, she claims that Tom kissed her neck once. Melvin touched her arm and brushed up against her (approximately four to eight times). And Rafael grabbed her arms and tried to kiss her.

### b. Tart

Tart's allegations of sexual harassment include the following:

1. A reference to her "big booty."
2. A comment that she would not be working if she were his woman.
3. A comment that she knew how to "ride."
4. A comment that she was "sexy."
5. A comment that a co-worker would "bend her over."

Additionally, a co-worker once tried to kiss her face and made a "jacking off" gesture.

The Seventh Circuit has observed:

> Drawing the line [between vulgar behavior and sexually harassing behavior] is not always easy. On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers. We spoke [previously] of "the line that separates the merely vulgar and mildly offensive from the deeply offensive and sexually harassing." It is not a bright line, obviously, this line between a merely unpleasant working environment on the one hand and a hostile or deeply repugnant one on the other.

*Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430-31 (7th Cir. 1995) (citations omitted). This is the precise conundrum that the Court faces here, but, after consideration of all of the facts and testimony, the Court concludes that the conduct alleged here is neither severe nor pervasive enough to withstand summary judgment.

As the Court noted above, the case law to which Ruba cites – and the case law found by this Court – demonstrates that much more egregious behavior has failed to establish a hostile work environment. Matherne and Tart attempt to distinguish the case law on which Ruba relies by repeatedly using the term "sexual assault" as a synonym for touching. In other words, Matherne and Tart argue that the cases on which Ruba relies are inapposite because no physical touching occurred there. But that is not the case. *See, e.g., Anderson v. Family Dollar Stores of Ark., Inc.*, 579 F.3d

858 (8th Cir. 2009) (affirming summary judgment and finding that supervisor's rubbing of plaintiff's shoulders or back at times, calling her "baby doll" and "honey," accusing her of not wanting to be "one of his girls," telling plaintiff she should be in bed with him and insinuating she would go farther in the company if they got along were not sufficiently severe or pervasive to create an abusive working environment); *Brooks v. City of San Mateo*, 229 F.3d 917 (9th Cir. 2000) (finding that coworker's touching of plaintiff's stomach and then her breast under her sweater was very offensive but did not rise to level of harassment for which Title VII offers a remedy); *Penry v. Fed. Home Loan Bank*, 155 F.3d 1257, 1261-63 (10th Cir. 1998) (affirming summary judgment on plaintiff's sexual harassment claim when she complained of unwanted physical contact, including her supervisor touching her shoulder, brushing against her as he passed her and periodically touching her arms or hands in a "slow and meaningful" manner); *Stacy v. Shoney's, Inc.*, 142 F.3d 436 (6th Cir. 1998) (affirming summary judgment on grounds that the conduct of plaintiff's manager making sexually-suggestive comments and leering looks, calling plaintiff at home to tell her he missed her, inappropriately touching her breast, and telling her that her tan looked good and he wished he "could see more of it," that he "liked it better when [she] wore [her] hair down," that if he had someone like her, he would not let her leave the house and that he'd move in with her and take care of her were not sufficiently severe or pervasive); *Adusumilli v. City of Chicago*, 164 F.3d 353, 357, 361-62 (7th Cir. 1998) (affirming summary judgment and holding conduct insufficient to support hostile environment claim when employee teased plaintiff, made sexual jokes aimed at her, told her not to wave at police officers "because people would think she was a prostitute," commented about low-necked tops, leered at her breasts, and touched her arm, fingers, or buttocks on four occasions); *Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir. 1993) (affirming

11

summary judgment after concluding no sexual harassment when plaintiff's supervisor asked plaintiff for dates, asked about her personal life, called her a "dumb blond," put his hand on her shoulder several times, placed "I love you" signs at her work station, and attempted to kiss her twice at work and once in a bar); *Saxton v. AT&T*, 10 F.3d 526 (7th Cir. 1993) (rejecting sexual harassment claim when plaintiffs' supervisor: (1) placed his hand on her knee several times; (2) rubbed his hand along her upper thigh; (3) pulled her and kissed her for two to three seconds until she pushed him away; and (4) "lurched" at her from behind bushes as if to grab her; and (5) teased her about her romantic interest in coworker); *Landers v. CHLN, Inc.*, Civ. A. No. 07-75, 2009 WL 803777 (E.D. Ky. Mar. 25, 2009) (concluding that multiple comments about plaintiff's breasts, requests to lick whip cream and wine off of her, inappropriate touching while hugging plaintiff, requests to go out, rubbing plaintiff's shoulders, arms and rear end and inappropriate text messages were not sufficiently severe or pervasive). Comparing the alleged sexual harassment here with that in the above-cited case law, this Court can only conclude that Matherne's and Tart's allegations fail to meet the standard to establish a hostile work environment.[3]

Ruba also argues that neither plaintiff can demonstrate that it failed to take prompt, remedial action. The Fifth Circuit has held that determining "[w]hether an employer's response to discriminatory conduct is sufficient 'will necessarily depend on the particular facts of case,'" such as the remedial steps taken and the severity of the harassment. *Hirras v. Nat'l R.R. Passenger Corp.*,

---

[3] Matherne and Tart also attempt to create a genuine issue of material fact by relying on theirs and Hyatt's testimony. For example, Hyatt testified that she witnessed Tom grabbing Matherne's rear-end and smacking it on two occasions. But Matherne testified that there was only one incident with Tom, when he tried to kiss her neck. Hyatt also testified that Tom grabbed Tart and Melvin brushed against Tart with his penis. But Tart never testified as to either incident. Matherne and Tart can not rely on the testimony of another when it conflicts with their own to create a genuine issue of material fact.

12

95 F.3d 396, 399-400 (5th Cir. 1996) (quoting *Waltman v. Int'l Paper*, 875 F.2d 468, 479 (5th Cir. 1989)). "When a company, once informed of allegations of . . . harassment, takes prompt remedial action to protect the claimant, the company may avoid Title VII liability." *Nash v. Electrospace Sys., Inc.*, 9 F.3d 401, 402 (5th Cir. 1993). If an employer receives notice of alleged sexual harassment and makes a prompt remedial response to the complaint that is reasonably calculated to end the harassment, the employer is not liable, even if the conduct in fact occurred. *Garcia v. Elf Atochem N. Am.*, 28 F.3d 446, 451 (5th Cir. 1994).

Even were the Court to find that the conduct alleged was sufficiently severe or pervasive enough to establish a hostile work environment, the Court concludes that both Matherne and Tart fail as to factor five as well. Here, Matherne has no evidence that Ruba failed to take prompt remedial action as a result of the alleged complaints. Matherne admitted that she did not know whether or not McCormick or Owen did anything in response to their complaints of harassment. She does not know whether McCormick or Owen spoke to the alleged harassers or disciplined them. In fact, after receipt of the complaint from Matherne, Owen immediately conducted an investigation. She reviewed the surveillance footage and spoke to the necessary parties. Garrison also conducted her own investigation into Matherne's complaint of harassment by Rafael. She conducted interviews, obtained statements and reviewed the surveillance footage. There was nothing that Garrison or Owen could find that corroborated Matherne's complaints. Notwithstanding their inability to corroborate Matherne's statements, Garrison moved Rafael to another shift so that Matherne would not have to work with him.

Tart's own deposition testimony reveals that she was moved to a different shift at her own request. After she was moved, she did not have to work with her alleged harasser. She admittedly

had no problems on her new shift. This is also sufficient to establish that Ruba took prompt remedial action in response to any complaint by Tart. Neither Matherne nor Tart can establish the fifth element of their claims. Accordingly, the Court finds that Ruba is entitled to summary judgment as a matter of law.

### 2. Constructive Discharge Claim

To prove constructive discharge, plaintiffs must show that a "reasonable person in [their] shoes would have felt compelled to resign." *See Faruki v. Parsons, SIP, Inc.*, 123 F.3d 315, 319 (5th Cir. 1997). To succeed on a claim of constructive discharge discrimination, "an employee 'must offer evidence that the employer made the employee's working conditions so intolerable that a reasonable employee would feel compelled to resign.'" *Stover v. Hattiesburg Pub. School Dist.*, 549 F.3d 985, 991 (5th Cir. 2008) (citing *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)). "This objective test has been referred to as the reasonable employee test." *Id.* A plaintiff must demonstrate a "greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment claim." *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998).

Because the Court has concluded that the alleged harassment here was not sufficiently severe or pervasive to constitute actionable sexual harassment, it naturally follows that it is insufficient to satisfy the higher standard of severity or pervasiveness required for constructive discharge. Because neither Matherne nor Tart can make the requisite showing, their claim for constructive discharge must be dismissed.

In addition, as it relates to Tart, the Court notes that she was moved to a different shift at her request. She had no problems with any of the workers on that shift. Yet she still resigned after the

14

shift change. Therefore, this too confirms that a reasonable person in her shoes would not have felt compelled to resign.

### 3. State-Law Claims

Both Matherne and Tart also claim that Ruba violated Louisiana's sexual harassment law. La. Rev. Stat. § 51:2231 *et seq.* This statutory scheme is a "mirror image" of Title VII. *See Sims & Brown & Root Indus. Servs., Inc.*, 889 F. Supp. 920, 925 n.3 (W.D. La. 1995); *Fishel v. Farley*, Civ. A. No. 93-480, 1994 WL 90325 at *2 (E.D. La. Mar. 16, 1994); *see also Bennett v. Corroon & Black Corp.*, 517 So.2d 1245, 1246-47 (La. Ct. App. 1987). Thus, in addressing Matherne's and Tart's federal-law claims, this Court has also decided and come to the same conclusion as to their state-law sexual harassment allegations.

## III. Conclusion

For the foregoing reasons,

**IT IS ORDERED** that the Motion for Summary Judgment [Doc. #56] is GRANTED.

New Orleans, Louisiana, this 27th day of June, 2014.

*[signature]*

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**